BUTTE FLORAL CO., RESPONDENT, *v.* REED, APPELLANT.

(No. 4,925.)

(Submitted October 23, 1922. Decided November 22, 1922.)

[211 Pac. 325.]

*Sales—Automobiles—Breach of Warranty—Remedies of Buyer —Second-hand Articles—Special Damages.*

Sales—Breach of Warranty—Evidence—Sufficiency.

1. Evidence in an action for damages for breach of warranty on the sale of a second-hand automobile truck, reviewed and *held* to show that defendant bought the truck from a third party and resold it to plaintiff, and not to support the theory of defendant that he merely acted as agent of the plaintiff in its purchase.

Same—Character of Contract—How Determined.

2. Where the character of. a contract is at issue, to-wit, whether it is one of sale, a sale with warranty, or one of agency, the primary test is the intention of the parties gathered from the whole scope and effect of the language employed.

Same—Breach of Warranty—Remedies of Buyer.

3. On breach of warranty, the buyer may either retain the article and sue for damages, or rescind the contract and sue for a return of the purchase price paid.

[65 Mont. 138.]

Same—Warranty—Second-hand Articles.

    4. The fact that an article sold is second-hand and known to be such does not of itself prevent an affirmation as to its condition constituting an express warranty.

Same—Breach of Warranty—Special Damages—What Recoverable.

    5. The buyer of a warranted second-hand automobile truck was entitled to recover the cost of a new body to replace the one on the machine found to be worthless, the expense of freight charges and installation on the chassis, as special damages, they having been the direct and natural result of defendant's breach of warranty, and the expenditures rendered necessary and made in good faith in attempting to use the truck.

Same—Special Damages—Elements Necessary.

    6. Special damages, to be recoverable, must be such as may fairly be supposed to have entered into the contemplation of the parties when they made the contract, and must be certain both in their nature and in respect to the cause from which they proceed.

*Appeals from District Court, Silver Bow County; Joseph R. Jackson, Judge.*

Action by the Butte Floral Company against J. R. Reed. From the judgment for plaintiff and from an order denying defendant's motion for a new trial, he appeals. Judgment and order affirmed.

Cause submitted on briefs of Counsel.

*Messrs. Templeman & Sanner,* for Appellant.

*Mr. J. A. Poore,* for Respondent.

MR. JUSTICE GALEN delivered the opinion of the court.

This is an action for damages for breach of warranty on the sale of an automobile truck. Upon issue joined, the case was tried to a jury, and resulted in a verdict and judgment for the plaintiff in the sum of $1,950.58. The appeal is from the judgment and from an order denying defendant's motion for a new trial.

---

4. Warranty upon sale of second-hand articles, see note in **L. R. A.** 1915B, 477.

· Circumstance that vendor assumes to assert a fact of which buyer is ignorant as decisive test of warranty, see note in **Ann. Cas.** 1913C, 711.

In its complaint plaintiff alleges: "That at the time of said sale and delivery defendant stated and warranted to plaintiff that the said motor-truck was a 2-ton truck and in first-class condition; that plaintiff and its officers at the time of said sale and delivery were unfamiliar with motor-trucks, and especially were unskilled in and unfamiliar with the particular truck which defendant then sold and delivered to plaintiff, and purchased and paid for the said truck, believing and relying upon the said statement and warranty of defendant that the said truck was a 2-ton truck and in first-class condition, and purchased and paid for said truck without any knowledge that the said statements and warranties of defendant were not true; that the said motor-truck was not a 2-ton truck, but was and is a 1½-ton truck; nor was the said truck in first-class condition, but then was, and now is, worthless and worn out. * * * All of which facts were known to the defendant at the time he made the said sale and the said warranties and representations to plaintiff, and none of which facts were known to the plaintiff." Further it is alleged that immediately upon ascertaining the condition of the truck the plaintiff offered to restore it to the defendant upon condition of repayment of the purchase price paid therefor and the expenses to which the plaintiff had been put, that the truck is, and at the time of its sale was, of no value, but that the steel body placed thereon by the plaintiff is reasonably worth the sum of $100.

Recovery was sought of the purchase price paid for the autotruck, $1,950, and also special damages alleged as follows: The cost of a steel body purchased for the truck of the reasonable value of $100; plus loading and freight charges thereon from Great Falls to Butte, amounting to $22.71; together with $177.87, the cost of installing such body; also $114.50 for putting a cab on the truck; $45.43 for insurance; and $15 for a state license thereon and, further, $125 to cover expenditures made to replace two broken front wheels; $55 paid a mechanic to replace a broken spring and in getting

the truck back to Butte. All of such items of special damage were claimed as the reasonable and necessary expenditures made by the plaintiff in attempting to use the truck in its business. The item as to the value of the body was eliminated by reason of the credit allowance given the defendant by the plaintiff in its complaint and specific instruction given the jury. The court denied a motion to strike the several items of special damages alleged, but upon the trial, on defendant's motion, withdrew from the consideration of the jury the two items as to the cost of the wheels and spring, and later by specific instruction excluded the expenditures alleged to have been made by the plaintiff for the installation of a cab, for insurance, and for a state license. This left before the jury the amount expended by the plaintiff in the purchase of the automobile truck, $1,950, and but two items of special damages, namely, expenditures made for loading and freight charges on shipment of the body from Great Falls to Butte, $22.71, and the cost of installing such body on the chassis, amounting to $177.87.

It is evident that the jury, in arriving at their verdict, found the value of the truck, with the body placed thereon, to be the sum of $200, deducted the same from the amount paid by the plaintiff, $1,950, and added the special items of damages remaining and submitted, $22.71 freight charges on the body, $177.87 for installation thereof, thus totaling $1,950.58, the amount of the verdict.

Though several alleged errors are assigned, upon which a reversal is sought, in our opinion there are but two questions determinative of the appeal, namely: (1) Did the transaction constitute a sale and breach of warranty, or was it one of agency exclusively? And (2) Were the items of special damages properly submitted to the jury?

The allegations of the complaint are amply supported by the evidence, save as to two items of special damages alleged, *viz.*, $45.43 for insurance and $15 for a state license, totaling $60.43. The jury were properly instructed to ignore these

items for failure of proof. It appears that in the month of April, 1919, the plaintiff desired to make purchase of a second-hand two-ton White truck for use in its business, and, understanding that the defendant handled second-hand trucks, Philo H. King, secretary-treasurer and general manager of the plaintiff company, called upon the defendant for the purpose of negotiating such a purchase. King testified: "I went into Mr. Reed's office, understanding that he sold second-hand White trucks—bought them and sold them—at various times, and told him I wanted a two-ton truck to use in hauling sand, coal, soil, fertilizer, and one thing and another for the greenhouses, and what I had in mind, and he told me that he could purchase me one of that kind, he thought; he didn't have one on hand, but he was going east and he had bought second-hand cars for a number of years, and that he could find me one, he felt quite sure, that would just answer the purpose. So I told him that if he could get a good two-ton truck to answer the purpose for which we wanted it that I would buy it from him for the Butte Floral Company, and that I had heard of a steel body that the city of Great Falls owned that I could purchase at a very reasonable price, and asked him if that would be all right to use on this two-ton truck, that I understood it was made for a two-ton White truck, and he said, 'Yes, sure,' that would be all right, and he felt quite sure he could purchase just what we wanted. So he advised me not to do anything further about a truck until I heard from him; if he found something he would let me know. So he went east, and a short time later I got a wire; that is, it was sent to Mr. Lingley, of the Sherman & Reed Company. He brought it over to the store and showed me the wire; said that this truck was a bargain at $1,950. He didn't state whether it was f. o. b. Butte or f. o. b. the east; so I asked Mr. Lingley to ask him whether it was f. o. b. Butte or f. o. b. the east, as I wanted to know what the truck would cost. So I think it was the next day Mr. Lingley came in and said the truck would be $1,950 f. o. b. cars Butte.

[65 Mont. 138.]

So, relying upon Mr. Reed's statement that the truck was a bargain at that price and would answer our purpose, I wired him $1,950." The telegram was admitted in evidence without objection, and is in words and figures as follows: "Western Union Telegram. 4/5/1919. A. G. Lingley, care Sherman & Reed, Butte, Montana. Have Mr. King wire First National Bank here nineteen hundred fifty dollars for two-ton White chassis; a bargain. Advise purchase. Ans. Penn Hotel. J. R. Reed."

Continuing, the witness testified: "I had no further conference with Mr. Reed until he advised me the truck had arrived; that was the latter part of May, 1919. * * * A day or two later I went down and saw Mr. Reed, and he took me back into the barn there, where it was rather dark, or garage. * * * Mr. Reed showed me this chassis and said that that was the one he had purchased in the east, and I looked at it. I didn't know anything about motor-trucks; I had no experience with them, and relied from the start upon his statement that he could secure one in first-class condition, and would do so, to answer the purpose, and this was a two-ton White truck. I asked him if it was in first-class condition and a two-ton truck; he stated it was, and he would guarantee it would answer the purpose, and in first-class condition; and so I requested him to take the chassis, that I didn't know anything about driving it, down to the Montana Iron Works, and put on the steel body that I had purchased from the city of Great Falls; and he had someone take the chassis down. I had no further conversation with Mr. Reed at the time this truck was being delivered to me, only that he stated that it was in first-class condition. He stated his mechanic had gone over the truck and oiled it up, so as to be sure there was plenty of grease in it, and to see that it was in the condition it should be, and he stated it was in first-class condition; he would guarantee it would answer our purpose in every way. * * * I purchased the steel body; we paid $100 for the body, $6 for loading charges, $16.71

for freight charges from Great Falls to Butte. That is the same body that I had theretofore talked to Mr. Reed about. I spoke to him when we first talked of getting the truck, about this steel body. He said it was all right to use on this two-ton chassis. The body arrived here, and I called Mr. Reed up and told him it was in, and he said he would take it off the cars for us, and he took it to the Montana Iron Works. Mr. Reed unloaded it for us and took it to the Montana Iron Works. Mr. Reed had the truck moved to the Montana Iron Works. I had that body placed upon the truck. Q. What did you pay for that? A. $177.87. That is for installing the steel body on the truck, on the chassis. That is the amount I was billed for it and which I paid for it. * * * The truck operated from about the 8th or 9th of July until the first part of September, 1919. At that time we took a team and pulled it into the barn, and it has been sitting there ever since. The last work done with the truck was hauling a little sand for a concrete wall we were putting in in a new house; then the drive shaft broke. * * * I do not know anything about autotrucks myself; I did not at the time of the purchase of this. I told Mr. Reed I wasn't familiar with trucks; I had no experience with them, never operated one nor purchased one. I relied upon Mr. Reed's statements absolutely as to this particular truck; if I hadn't I would have made other investigation; but I felt that Mr. Reed would be fair and square in the matter and deliver what he agreed to deliver. When I say 'me' I refer to the company I represent, the Butte Floral Company. * * * I commenced to feel that the truck wasn't right, wasn't in the condition that Mr. Reed had guaranteed it to be; so I went down to Reed's place to see him, and he was out of town, at his ranch, I believe, at that time; so I went up to see his mechanic, Mr. Deacon, and explained to him that they had broken the drive shaft, and I felt that things were not as they should be with the truck, and asked him if he would go out and look at it, and Mr. Deacon went out. That was

[65 Mont. 138.]

the first time I understood or ascertained the truck was valueless, no good, and it cost more to operate it than it was worth. That was the Wednesday, I think, in Stepember, after the State Fair; I don't know just the date—the first part of September, 1919. * * * I went to see Mr. Reed. I don't believe Mr. Reed was in town at the time, but when he returned I found him and told him that I felt the truck wasn't as represented, and that I desired him to take it off the hands of the Butte Floral Company and return me the money which we had expended in endeavoring to use the truck for the purpose which he guaranteed it would be suitable for; and he refused to do that; continued to insist that the truck was in good shape, and I felt positive at that time that it wasn't. He refused to do that. That was in September, I feel quite satisfied; I couldn't tell the exact date; it was soon after I found out about the condition of it and I could locate Mr. Reed. * * * Mr. Reed never gave me a bill of sale for the truck. I requested a bill of sale each time I went to the office. I went down there two or three times. The first day Mr. Reed was out of town, and finally I found Mr. Reed. Mr. Lingley advised me—I think Mr. Lingley and the young lady were both in the office—that Mr. Reed would give a me a bill of sale on his return, and I finally found Mr. Reed, and he said, 'Well, I will make you out one,' but I never received it. He never made a bill of sale. He promised to."

On cross-examination he testified: "I spoke to Mr. Reed, told him we were in the market—the Butte Floral Company was—for a two-ton White truck chassis, and Mr. Reed didn't have any, he stated, but he was going east and was going to buy some second-hand cars, and he felt sure that he could purchase one that would answer the purpose. I told him what we wished it for, we wanted to use it for hauling coal and soil and fertilizer, and in connection with the greenhouse work, and that I had in mind a body, a steel body, in Great Falls, which the city desired to sell at quite a reasonable

price, and asked him if that would be suitable to put on it; he stated it would; and told him if he could get a truck, a two-ton White chassis, we would buy it from him, if we could get it at the right price and he would guarantee it to be in good condition and suitable for our purpose. He said he felt sure that he could get just what we wanted and for us not to do anything until we heard from him. That was the substance of the conversation at that time.    *    *    * I did not know that Mr. Reed was not engaged in the purchase and sale of trucks; I understood that he was. Mr. Reed told me at the time that he had bought a great many second-hand Whites, and that he understood Whites, knew them, and I was satisfied that his statement was correct, because I knew he had at one time been representing the White.    *    *    * Mr. Reed said he was going east, and he felt quite sure that he could purchase just the chassis we wanted and would answer our purpose, and could save us a great deal of money, and not to do anything until we heard from him.    *    *    * I do not think I said that the thing that convinced me that the truck was not right was the breaking of the drive shaft. I took Mr. Deacon out there and told him that it didn't seem to me that the truck was as warranted and wasn't in good condition, and he said it wasn't worth a damn. I said this morning he said, 'It wasn't worth anything.'    *    *    * I paid $100 for this body. I consider that a reasonable charge. I am willing to allow a credit of that amount on our claim."

Mr. George N. Thurston testified that he was an experienced truck driver, and was the driver of this truck for the Butte Floral Company. He made a trip to Deer Lodge and return with the unloaded truck and had trouble getting there and back; also had trouble in loading a car of fertilizer there; the truck would not handle more than 500 or 600 pounds at a load. He unloaded a car of fertilizer at Butte with the truck and two teams. He hauled about ten loads with the truck, of 500 or 600 pounds to the load, and had to finish with teams. He had trouble with the clutch, the wheels, the

springs, the steering apparatus. It would not operate satis-. factorily. He tried to make a trip to Helena with it. It wouldn't pull the hills with a small load nor without a load. He also tried to use it in cleaning up around the greenhouses, but without success, and finally he broke the drive shaft, and they did not try to operate it after that.

Clarence S. Woolfolk, as a witness for the plaintiff testified: "I am a machinist. I have been such about sixteen or seventeen years. I have lived in Butte three years. I worked for the White Company and their branches for about twelve years. I worked at the Portland house. I was traveling on the road for the White Company through the Northwest territory about five years, and traveled out of San Francisco for about four years; worked as a local in the shop, and all through the whole state of California, through the Yosemite Valley. I am shop foreman of the Butte Motor Truck Company. While I was working for the White Company I was traveling machinist and inspector for that company. I have seen a certain truck which it is claimed Mr. Reed sold to the Butte Floral Company. Mr. King came in for somebody to inspect it, and I went out on the local service job of inspecting, and that was the truck I found out at the Butte Floral. * * * The front wheel bearings were all very loose; the spindles were very loose, worn on the spindles, worn in the housing, that is, the wheel housing, flange broken; the steering gear from one end to the other was all loose, practically worn out; the cylinders were cracked; the valves were loose and worn out; the timing gear was loose; the cam shaft was worn out, also the valve lift, rolls and pins; the engine loose in the frame; carburetor worn out; the clutch in bad shape; the transmission, fulcrum and all shift arrangement loose and worn; universal joint worn out; drive shaft broken; differential loose on rear axle housing; requires oversized studs; wheels loose on spindles, rear wheels, that is; all brake rigging loose and worn out on axle housing; brake studs out in housing; rear wheels loose on rear axles; all

spring shackle bolts, bushings, and shackles require replacing; carburetor and magneto control worn out; that is about all I can remember. The general condition of the car at the time I examined it was that it was worn out.    *   *   *   The model of the car is 1911, G. T. B. The capacity of the truck at the time it was built was a ton and a half. When we declared war is when the two-ton truck came out. It was in 1918, if that was when we declared war. They were making a two-ton truck prior to 1919, the White people were. There are lots of two-ton White trucks in Butte to-day.   *   *   *   Q. Do you know what the reasonable value of this truck is at this time, assuming that the drive shaft wasn't broken? A. I wouldn't have it. It would be worth whatever a junkman would pay for it; I don't know what that would be; I wouldn't imagine it would be over $200 at the limit. That is not including the body; I am speaking of the chassis.'' On cross-examination he said: ''I want the jury to understand that it was worn plumb out.'' And on redirect examination he further testified: ''Q. Mr. Woolfolk, if you were called upon to put this car in operation so that it might operate successfully, have you any idea of what it would cost? A. Well, I wouldn't take the job less than about $1,500, and figure on making anything. If I put $1,500 on the car, in my judgment, the car would then be worth about $850 or $900.''

Charles Deacon a witness for the plaintiff, testified: ''I am a machinist; I have been such fourteen years. I have had eight years' experience as a machinist in repairing and overhauling White trucks.   *   *   *   I was in the employ of Sherman & Reed during the months of April and May and June, 1919. I have seen the truck which it is claimed Mr. Reed, the defendant in this action, sold to the Butte Floral Company. I first saw it at the Milwaukee depot. Mr. Reed, the defendant, sent me down, and I unloaded the car; it was in the box-car at that time. After I unloaded it I brought it out on the platform for one of the other boys to bring up to

the shop. It was subsequently taken to the shop—Sherman & Reed's machine-shop here in Butte. That was in May, 1919, between the 16th and 20th. I had a conversation with Mr. Reed the next day. He told me to look the truck over, as several parts were missing, he bought back in New York. I looked the truck over. I reported it to Mr. Reed. I told Mr. Reed it was an old, old truck; to put it in shape it would cost a lot of money. Mr. Reed told me to fix the truck up in running condition. I did work on the truck. We had the truck in the shop about four days. * * * He told one of the other boys to paint the engine. I noticed the engine was rusty, and there were two cracks in the block, one in front and one in the rear of the block. I had a further conversation with Mr. Reed as to the condition of the car. I told him that the car was worn, and worn badly. I told him it ought to be in the junk pile. I don't think he made any answer. I do not know where the car was taken after it was taken out of Mr. Reed's place of business. It remained upstairs for four days, and that is all I know; that was the machine-shop. I do not know where it was taken after it was removed from the machine-shop. I next saw the car after that about six weeks. It was down at the Butte Floral greenhouse; I went out then to look at the wheels. I found the wheel all to pieces. * * * Two leaves of the front spring were broken; it wasn't noticeable at the time it was delivered, because it was broken right at the shaft. The leaves had probably been driven together and tightened up. * * * After the truck came back from Helena, and on Thanksgiving Day, 1919, I went out to the Butte Floral Company to look at the truck, with Mr. Reed, Mr. King, Mr. Woolfolk, to make an examination of the truck mechanically. That is the same Mr. Clarence Woolfolk who just testified. I sat down and watched him go over the truck. He made a thorough examination of it. I looked the truck over while it was in the shop of Sherman & Reed, prior to the time it was delivered. From my examination of the truck I am in a position to say

the condition of the truck. At the time it was delivered the truck had had so much wear that it was practically worn out all through. I have seen such trucks bought and sold. I do not know what the reasonable value of this truck would be at the time it was delivered to the Butte Floral, not very much, if you were going to figure the truck to make it pay and do commercial work with it. It would have value as a truck, if you want to pay all the bills on it. To put it in shape for a man to work, and the man make a living out of it, and the people he was working for to get theirs out of it, it would cost at least $1,500, to put the truck in reasonable condition. * * * Its value at the time it was delivered, for trucking purposes, without having any additional work done on it, would be very little; I wouldn't want it; I would go broke trying to operate it. I wouldn't say it had any value. I showed Mr. Reed the cylinder blocks were cracked. He asked me what that would cause on the motor, what effect that would have on the motor. I told him it wouldn't have no effect on the motor, on account of the working. Of course, that all depends on the man operating the truck with the block cracked. It was broke in front and rear. Mr. Reed told a man in the shop to paint the motor. There were three of us in the shop at that time; he did not address his remarks to any person in particular. That was after I had shown him in the break in the cylinder block. Mr. Prentice painted the cylinder block after that, Mr. Tripp Prentice. He is still working for Sherman & Reed. I can tell from an examination of this truck the year in which it was made; it was manufactured in 1911.''

Joe Mikel, a witness for the plaintiff, also testified that he had examined the truck. He said it was worn out in nearly all its parts, and corroborated the testimony of Woolfolk and Deacon. This evidence constituted plaintiff's case.

In defense Mr. Reed testified that he thought it was understood that the price of $1,950 for the truck was f. o. b. Butte; that, as to the items which went to make up this sum,

[65 Mont. 138.]

he paid $1,450 for the truck, and he added $225 freight, unloading and installing the lighting system in the lamps and going over the car, $125, and the amount of his expenditures in Chicago, New York and Brooklyn in looking around for the truck. He loaded the truck on the cars at New York, and saw it at the Milwaukee depot when his men unloaded it in Butte, and took the truck to his shop for the "purpose of going over it before it was turned over to Mr. King." He installed a Presto line and furnished a Presto tank and put new lamps on it, which he estimated at $75 at the time he made the price to Mr. King, and had his men "go over" the car, clean it up, grind the carbon, and make the adjustments necessary, which he had estimated at $50 when he fixed the price to Mr. King. He gave instructions to his men to see that the truck was in good shape. After Mr. King had complained to him about the truck not working satisfactorily, he said to Mr. King: "We would like to see you pleased in this matter. We will do everything that we can in reason, have any of these adjustments that we can made. You must understand this is a second-hand truck. Any adjustments that we can make reasonably we will be glad to do it for you; in fact, in doing so, if you are not satisfied, why we would be glad not even to make you a charge for it, because we had rather see you pleased in the matter." At the time he delivered the truck to Mr. King, he told him that he had gone over the truck, and that the truck was in good shape. Mr. Reed had another automobile in the car in which this truck was shipped. The freight on the two cars was $225. Mr. King paid all the freight because Mr. Reed stated on his direct examination that he added $225 freight to the original cost price in making up the item of $1,950. Mr. Reed did not tell his mechanic how much to spend on the car after he had taken it to his machine-shop in Butte, but told him to "go over the car, and what necessary adjustments were needed to put it in good shape to do so. I did not tell him how much he was to expend on it to put it in good shape.

I did not limit him to $125." He also testified: "After four days the car was in shape to take out. * * * I told Mr. King the next day as soon as it was put on the floor downstairs it was ready for him. * * * I told him this was the truck I had purchased for him, and it was all in good shape; * * * that it was in good shape to do the work. I meant that it was in good running condition. I made that statement to Mr. King at the time. * * * I believed it was in good shape. Believing it was in good shape, I represented to Mr. King that it was in good shape. That wasn't any idle guess on my part."

That there was a sale and warranty is clearly established [1] by the evidence. A sale "is a contract by which, for a pecuniary consideration, called a price, one transfers to another an interest in property" (sec. 7581, Rev. Codes 1921), and "a warranty is an engagement by which a seller assures to a buyer the existence of some fact affecting the transaction whether past, present, or future" (sec. 7606), and "an agent is one who represents another, called the principal, in dealings with third persons" (sec. 7928). An agent has such authority only as the principal confers upon him (sec. 7945), and whether the transaction was a sale, a sale with warranty, or one of agency must be established or disproved by the facts taken as a whole (2 C. J., p. 423). "One who sells or agrees to sell personal property, knowing that the buyer relies upon his advice or judgment, thereby warrants to the buyer that neither the seller, nor any agent employed by him in the transaction, knows the existence of any fact concerning the thing sold which would, to his knowledge, destroy the buyer's inducement to buy." (Sec. 7610, Rev. Codes 1921.)

The primary test as to the character of the contract is the [2] intention of the parties gathered from the whole scope and effect of the language employed. (23 R. C. L., p. 1216.)

From the facts recited there is, in our opinion, no doubt as to the proper classification of the transaction. It was a sale with warranty, and bears none of the *indicia* of agency.

[65 Mont. 138.]

[3] That the warranty was breached is clearly established, and the plaintiff was within its rights in retaining the automobile truck and suing for damages for breach of the warranty, although it had the election of rescinding the contract and suing for a return of the purchase price paid. (*Doornbos* v. *Thomas*, 50 Mont. 370, 147 Pac. 277; *Advance-Rumely Thresher Co.* v. *Terpening*, 58 Mont. 507, 193 Pac. 752; *Rickards* v. *Aultman & Taylor Co.*, 64 Mont. 394, 210 Pac. 82.) The fact that an article is second-hand, and known [4] to be such, does not of itself prevent an affirmation as to its condition constituting an express warranty. (24 R. C. L. p. 171.)

As to the items of special damages, we think those sub- [5] mitted to the jury were properly recoverable under the allegations of the complaint and the evidence. Special damages are those which are the natural, but not the necessary, result of the injury (*O'Brien* v. *Quinn*, 35 Mont. 441, 90 Pac. 166; *Gordon* v. *Northern Pac. R. Co.*, 39 Mont. 571, 18 Ann. Cas. 583, 104 Pac. 679), and in this case we think the items of special damages submitted to the jury were naturally resultant in consequence of defendant's breach of warranty. They were the direct consequence of defendant's breach of warranty, and were properly recoverable. (*Luitweiler Pumping Engine Co.* v. *Ukiah Water & Imp. Co.*, 16 Cal. App. 198, 116 Pac. 707, 712; *Hausken* v. *Hodson-Feenaughty Co.*, 109 Wash. 606, 187 Pac. 319; *Mine Supply Co.* v. *Columbia Mining Co.*, 48 Or. 391, 86 Pac. 789; Mechem on Sales, sec. 1757; 35 Cyc., p. 472.)

The right of recovery of special damages is subject to two [6] conditions or limitations: (1) The damages must be such as may fairly be supposed to have entered into the contemplation of the parties when they made the contract, that is, such as might naturally be expected to follow a breach; and (2) they must be certain, both in their nature and in respect to the cause from which they proceed. (24 R. C. L., p. 76.) The detriment caused by the breach of warranty as to the

fitness of the truck for particular purposes entitles the plaintiff to recover expenditures made in good faith in attempting to use it. (Sec. 8680, Rev. Codes 1921; *Cohn* v. *Bessemer Gas Engine Co.,* 44 Cal. App. 85, 186 Pac. 201.)

"When the seller of personal property has breached his express warranty to furnish an article of a specified kind, quality, or condition, he is liable, as in the case of any other kind of contract, for both general and special damages." (*Feeney & Bremer Co.* v. *Stone,* 89 Or. 360, 369, 171 Pac. 569, 572; *Parsons* v. *Smith,* 51 Okl. 495, 151 Pac. 862; Mechem on Sales, secs. 1817–1821; 35 Cyc., pp. 451, 465.)

As said by Mr. Justice Farr, speaking for this court in the recent decision in the case of *Rickards* v. *Aultman & Taylor Machinery Co., supra:* "Special damages, that is, those damages which actually and naturally result from the action of the defendant, but are not such a necessary result that they will be implied by law, must be specially pleaded in order to be recovered"—citing cases. Here the plaintiff properly pleaded such special damages, and the proof amply warranted their recovery. Relying on the warranty, and in an effort to use the truck for the purposes intended, in good faith, plaintiff made expenditures which he is justly entitled to recover as special damages.

The judgment and order are affirmed.

*Affirmed.*

Associate Justices Farr, Cooper and Holloway concur.